[Cite as *Badawi v. Ohio State Univ. Wexner Med. Ctr.*, 2023-Ohio-2654.]

## IN THE COURT OF CLAIMS OF OHIO

| | |
|---|---|
| MOHAMED BADAWI, Admr. | Case No. 2019-00122JD |
| Plaintiff | Judge Patrick E. Sheeran |
| v. | <u>DECISION</u> |
| THE OHIO STATE UNIVERSITY WEXNER MEDICAL CENTER | |
| Defendant | |

### I. Introduction

{¶1} Plaintiff Mohamed Badawi, Administrator of the Estate of Malak Badawi, has brought a civil lawsuit against Defendant The Ohio State University Wexner Medical Center.[1] Plaintiff's lawsuit stems from the death of Malak Badawi (daughter of Mohamed Badawi ["Badawi"] and Sara Elshazli ["Elshazli"]) who died on June 8, 2018, at Nationwide Children's Hospital in Columbus, Ohio, after Malak was transferred to Nationwide Children's Hospital following her birth by emergency Cesarean section (C-section) on June 7, 2018, at The Ohio State University Wexner Medical Center (OSUWMC). A Supplementary Medical Certification lists Malak Badawi's cause of death as hypoxic ischemic injury due to uterine rupture. (Joint Exhibit M.)

{¶2} Upon careful consideration of all the evidence (including witness testimony and exhibits admitted into evidence), the parties' arguments, as well as post-trial filings by the parties, the Court holds that Badawi has proven claims of negligence and wrongful death by a preponderance of the evidence. The Court further holds that Badawi is entitled to damages in the amount of Two Million, Seven Hundred Fifty Thousand Dollars (USD

---

[1] Mohamed Badawi's Complaint is accompanied by a copy of an entry of the Franklin County (Ohio) Probate Court in which the Probate Court appointed Badawi as Administrator of the Estate of Malak Badawi. In Defendant's Answer, Defendant has admitted that Mohamed Badawi was appointed Administrator of Malak Badawi's estate by the Franklin County (Ohio) Probate Court. (Answer, ¶ 2.) Thus, there is no dispute that Mohamed Badawi is the Administrator of the Estate of Malak Badawi.

$2,750,000.00), plus Twenty-Five Dollars (USD $25.00) (the cost of the filing fee) and post-judgment interest.

## II. Procedural History

{¶3} Badawi has brought claims of negligence, wrongful death, and survivorship against The Ohio State University Wexner Medical Center. (Complaint.) Badawi also has brought a claim seeking a determination under R.C. 2743.02(F) that each of the physicians, attending physicians, residents, interns, fellows, therapists, nurses, and others who provided care to Sara Elshazli, during the labor and delivery admission of June 6-7, 2018, were acting within the course and scope of their employment while rendering care. (Complaint, ¶ 31.)

{¶4} In Defendant's Answer, Defendant has admitted that, at all times relevant, Defendant "employed certain physicians[,] * * * nurses and other providers who were acting in the course and scope of their respective employment in the treatment of Malak Badawi" (Answer, ¶ 5), and that, at all times relevant, Defendant employed certain physicians, nurses and other providers who were acting in the course and scope of their respective employment in the treatment of Elshazli and Malak Badawi. (Answer, ¶ 6, 7.) Defendant's admissions resolve whether Defendant's medical providers who cared for Elshazli and Malak Badawi were Defendant's employees and whether their actions were in the course and scope of their employment.

{¶5} The case proceeded to a bench trial on issues of liability and damages as to Badawi's claims of negligence, wrongful death, and survivorship. After Badawi's opening statement, pursuant to Civ.R. 50, Defendant, through counsel, moved for a partial directed verdict. The Court denied Defendant's motion.

{¶6} After Badawi presented his case-in-chief, Defendant moved for a directed verdict, which the Court granted in part, and denied in part. The Court granted Defendant's motion for a directed verdict on claims that Defendant failed to gain informed consent, as alleged in the Complaint at paragraph 28(c) and that Defendant failed to properly train resident physicians and nurses on the indications of an ongoing uterine rupture, as alleged in the Complaint at paragraph 28(k). The Court further granted Defendant's motion for a directed verdict on claims of (i) loss of support from reasonably

expected earning capacity of Malak Badawi, as alleged in the Complaint at paragraph 33(d), (ii) compensable funeral expenses and burial expenses, as alleged in the Complaint at paragraph 33(e), (iii) compensable expenses based on medical bills, and (iv) a failure to prove the Survivorship Claim, as alleged in the Complaint at paragraph 34.

{¶7} The Court denied Defendant's motion for a directed verdict on the claim that Defendant failed to initiate the chain of command, as alleged in the Complaint at paragraph 28(n).  The Court initially deferred a final ruling whether a directed verdict was proper on the claim that Defendant improperly administered Pitocin, as alleged in the Complaint at paragraph 28(d).  Later, however, the Court granted Defendant's motion for a directed verdict as to Defendant's alleged improper administration of Pitocin, as set forth in the Complaint at paragraph 28(d).

{¶8} The gravamen of Badawi's remaining allegations concern whether, on June 7, 2018, Defendant, through its medical team who cared for Elshazli and her unborn child, breached a duty of care to Elshazli and her unborn child, whether injuries in this case are the proximate result of the breach, and what damages, if any, should be awarded.  Badawi essentially maintains that, on June 7, 2018, Kara L. Malone, M.D. (attending physician), Erin Walker, M.D., (a first-year resident at that time) and Elizabeth Miller, R.N. (a nurse with about 1½ years' experience as a labor and delivery nurse at that time) were negligent in their care of Elshazli and her unborn child.  The negligence alleged against Dr. Malone is, in part, based on her absence from Elshazli's room between the hours of 0840 and 1240, because it was during those times that key events relevant to a determination whether to perform a C-section are claimed to have occurred.[2]

{¶9} Defendant denies liability, essentially contending that its employees' actions were within the standard of care and that Malak Badawi's injuries were not the proximate result of any medical negligence by Defendant's medical team.  Moreover, Defendant contends that evidence gleaned from pathology findings conclusively shows that Malak's injuries occurred well before her birth on June 7, 2018.

---

[2] What occurred, or did not occur, on June 7, 2018, between 0700 and 1313 hours will be discussed in detail *infra*.

### III. Relevant Background

{¶10} Badawi and Elshazli moved to the United States from Egypt. Badawi, who holds a Ph.D. in Pharmaceutical Research from The Ohio State University (OSU), is the son of a pharmacist and a pediatrician. After Badawi earned his Ph.D. from OSU, he participated in a post-doctoral fellowship at OSU. Elshazli holds a degree in accounting and is a certified public accountant.

{¶11} Badawi and Elshazli met in 2011 and were married in 2013. The couple wanted a large family and planned to have several children. Their first child, Laila, was born in January 2015. Laila was delivered by Cesarean section at OSUWMC. Although Elshazli preferred to have Laila delivered vaginally, the course of her delivery did not permit that. The Cesarean section was performed because Laila exhibited signs of fetal distress, as her condition was charted as "nonreassuring fetal well-being." As a result, medical providers at OSUWMC recommended an immediate Cesarean section, and Elshazli agreed. Laila was successfully delivered with no complications.

{¶12} Over two years later, Elshazli became pregnant again. Elshazli wished to deliver her second child through a vaginal birth, if possible, instead of by Cesarean section. Elshazli discussed her wishes with Andrea Snyder, M.D., Ph.D., whom Elshazli saw for prenatal care at OSUWMC. Dr. Snyder explained Elshazli's delivery options to her. Understanding this, Elshazli decided to undergo a trial of labor, known as TOLAC (trial of labor after Cesarean section), with a desired result of having spontaneous labor and a vaginal birth, known as VBAC (vaginal birth after Cesarean section). The plan discussed and approved by both Dr. Snyder and Elshazli was for Elshazli to undergo a Cesarean section on June 8, 2018, if, by that time, Elshazli had not begun her labor.

{¶13} On June 6, 2018, Elshazli began to experience symptoms of spontaneous labor. Elshazli went to OSUWMC where she was admitted that day to the labor and delivery unit. Elshazli initially came under the care of Katherine Stafford, M.D., who served as Elshazli's attending physician, along with a team of other medical providers. On June 7, 2018, at 7 a.m. (0700 hours), the normal time for a shift change, Elshazli's care was transferred to Kara L. Malone, M.D., who served as Elshazli's attending physician, along with a team of other medical providers, including Erin Walker, M.D., a first-year resident at the time, and Elizabeth Miller, R.N. Nurse Miller was assigned to

provide nursing care to Elshazli on a one-to-one basis, since a woman who is undergoing a trial of labor after a C-section ("TOLAC patient") is at a higher risk for uterine rupture. Before Dr. Malone and nurses assumed the care of Elshazli, Dr. Malone and the nurses were briefed and reviewed Elshazli's situation.

{¶14} At about 1:13 p.m. (1313 hours) on June 7, 2018, Dr. Malone determined that Elshazli required an emergency C-section. During the C-section, the OSUWMC team discovered that Elshazli had sustained a uterine rupture with part of the baby (an arm) extruding from the uterus. The baby, whom Badawi and Elshazli named Malak, was in very poor condition. According to the Delivery Summary contained in Elshazli's medical record, Malak was assigned the following APGAR scores:

| Skin Color | 0 | 0 | 0 | 1 |
|---|---|---|---|---|
| Heart Rate | 0 | 1 | 2 | 2 |
| Reflex Irritability | 0 | 0 | 0 | 0 |
| Muscle Tone | 0 | 0 | 0 | 0 |
| Respiratory Effort | 0 | 0 | 0 | 0 |
| Total | 0 | 1 | 2 | 3 |
| | 1 minute: 0 | 5 minute: 1 | 10 minute: 2 | 15 minute: 3 |
| Apgars assigned by: PEDS | | | | |

(Joint Ex. A 2, p. 150 of PDF.)

{¶15} Apgar scores are based on a measurement of from 0 to 10, with 10 being the best possible score, and 0 being the worst. As a result of these extremely poor scores, Malak was quickly transferred to the neonatal intensive care unit at OSUWMC. Malak was transferred shortly thereafter to Nationwide Children's Hospital (NCH) for further treatment due to apparent hypoxic injury. Unfortunately, there was little that NCH could do, and Badawi and Elshazli faced the agonizing decision whether to terminate the artificial means that were helping to keep Malak alive, understanding that, even if Malak were somehow able to survive, she would have devastating developmental consequences. Badawi and Elshazli opted to remove the life support from Malak, and

they spent Malak's last hours with her. Malak died on June 8, 2018, scant hours after Badawi and Elshazli consented to the removal of external life supports.

{¶16} Badawi, Elshazli, and Laila later relocated to Illinois. Elshazli became pregnant again and gave birth to a son, Ali, by Cesarean section in 2020. At the time of trial, both Badawi and Elshazli were receiving psychological treatment for post-traumatic stress disorder (PTSD) related to the circumstances of Malak's birth by emergency C-section.

## IV. Law and Analysis

{¶17} Under Ohio law, Badawi, the Administrator of Malak's estate, is required to establish his civil claims by a preponderance of the evidence. *See Merrick v. Ditzler*, 91 Ohio St. 256, 260, 110 N.E. 493 (1915) ("[i]n the ordinary civil case the degree of proof, or the quality of persuasion as some text-writers characterize it, is a mere preponderance of the evidence"); *Weishaar v. Strimbu*, 76 Ohio App.3d 276, 282, 601 N.E.2d 587 (8th Dist.1991). A preponderance of the evidence "is defined as that measure of proof that convinces the judge or jury that the existence of the fact sought to be proved is more likely than its nonexistence." *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, 958 N.E.2d 1235, ¶ 54.

{¶18} On the trial of a civil case (or criminal case), the weight to be given the evidence and the credibility of the witnesses is primarily for the trier of the facts to determine. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The Court is the trier-of-facts in this case. The Court therefore must give appropriate weight to the evidence presented, as it reviews and evaluates the evidence. The Court is free to believe all, part, or none of the testimony of any witnesses, including expert witnesses who have testified in this trial. *See State v. Green*, 10th Dist. Franklin No. 03AP-813, 2004-Ohio-3697, ¶ 24.

{¶19} Under Ohio law, a specialized hospital should be held to a higher standard of care because it specializes. *Wilburn v. Cleveland Psych. Inst.*, 126 Ohio App.3d 153, 156, 709 N.E.2d 1220 (10th Dist.1998); *see Johnson v. Grant Hosp.*, 32 Ohio St.2d 169, 178, 291 N.E.2d 440 (1972) ("[a] general hospital, which ordinarily does not and is not equipped to treat mental patients, should not be held to the same standard of care as a

hospital which is operated and equipped to provide care for a patient who has displayed a tendency to commit suicide"); *Sabol v. Richmond Hts. Gen. Hosp.*, 111 Ohio App.3d 598, 602, 676 N.E.2d 958 (8th Dist.1996) ("[c]rucial to *Johnson* is the idea that a general hospital caring for a suicidal patient cannot be held to the same standard of care as a specialized hospital which routinely deals with such patients").

**{¶20}** Here, the evidence shows that Defendant is an academic medical center that routinely provides care to pregnant women who are undergoing TOLAC/VBAC and that also provides post-graduate medical education in the field of obstetrics and gynecology. Under Ohio law, Defendant therefore should be held to a standard of care consistent with an academic medical center that provides specialized care to women who are undergoing TOLAC and that provides post-graduate medical education in the field of obstetrics and gynecology.

**{¶21}** The Ohio Supreme Court has recognized that, in the medical context, "because only individuals practice medicine, only individuals can commit medical malpractice." *Natl. Union Fire Ins. Co. v. Wuerth*, 122 Ohio St.3d 594, 2009-Ohio-3601, 913 N.E.2d 939, ¶ 14. But the Ohio Supreme Court also has recognized that, under the doctrine of respondeat superior, a hospital "is liable for the negligent acts of its employees." *Berdyck v. Shinde*, 66 Ohio St.3d 573, 577, 613 N.E.2d 1014 (1993), citing *Klema v. St. Elizabeth's Hosp. of Youngstown*, 170 Ohio St. 519, 166 N.E.2d 765 (1960).

**{¶22}** Defendant has admitted that it employed certain individuals who were acting within the course and scope of their employment when they provided medical care to Elshazli. (Answer, ¶ 5, 6, 7). Under the doctrine of respondeat superior, Defendant therefore may be liable for any negligent acts of its employees when they provided medical care to Elshazli and her unborn child during Elshazli's hospitalization at OSUWMC in June 2018.[3]

---

[3] The Ohio Supreme Court has stated:

"The modern provision of medical care is a complex process becoming increasingly more complicated as medical technology advances. Large teaching hospitals * * * care for patients with teams of professionals, some of whom never actually come in contact with the treated patient but whose expertise is nevertheless vital to the treatment and recovery of patients.

"* * *

**{¶23}** The Ohio Supreme Court has identified elements to establish negligence of a hospital employee as follows: "To establish the negligence of a hospital employee, an injured party must demonstrate that a duty of care was owed to the injured party by the employee, that the employee breached that duty, and that the injuries concerned were the proximate result of the breach." *Berdyck v. Shinde*, 66 Ohio St.3d 573, 577, 613 N.E.2d 1014 (1993).[4]

**{¶24}** The Court concludes that, as a matter of law, Defendant, through its medical team, owed a duty of care to Elshazli and Malak Badawi that complied with accepted standards of care. *See Mussivand v. David*, 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989) ("[t]he existence of a duty in a negligence action is a question of law for the court to determine. * * * There is no formula for ascertaining whether a duty exists").

**{¶25}** With respect to the standard of care that should apply to medical professionals, the Ohio Supreme Court has instructed that "the standard of care applicable to medical professionals is to exercise the degree of care that a medical professional of ordinary skill, care, and diligence would exercise under similar circumstances." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 27, citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976), at paragraph one of the syllabus. In *Cromer*, the Ohio Supreme Court explained:

> Although the standard of care for a medical professional is heightened, it does not necessarily supplant all consideration of

---

"Medical professionals may be held accountable when they undertake to care for a patient and their actions do not meet the standard of care for such actions as established by expert testimony. *** " (Citations omitted.) * * *.

*Lownsbury v. VanBuren*, 94 Ohio St.3d 231, 236-237, 762 N.E.2d 354 (2002), quoting *Mozingo v. Pitt Cty. Mem. Hosp., Inc.*, 331 N.C. 182, 188-189, 415 S.E.2d 341 (1992).

[4] Under Ohio law, cause in fact and proximate cause are distinct. *See Ackison v. Anchor Packing Co.*, 120 Ohio St.3d 228, 2008-Ohio-5243, 897 N.E.2d 1118, ¶ 48. The standard test for establishing cause in fact is "but for" causation. *Ackison* at ¶ 48. In *Anderson v. St. Francis-St. George Hosp., Inc.*, 77 Ohio St.3d 82, 84-85, 671 N.E.2d 225 (1996), the Ohio Supreme Court explained that "a defendant's conduct is a cause of the event (or harm) if the event (or harm) would not have occurred *but for* that conduct; conversely, the defendant's conduct is not the cause of the event (or harm) if the event (or harm) would have occurred regardless of the conduct." (Emphasis sic). And in *Ackison*, the Ohio Supreme Court stated, "Once cause in fact is established, a plaintiff then must establish proximate cause in order to hold a defendant liable." *Ackison* at ¶ 48. In *Clinger v. Duncan*, 166 Ohio St. 216, 223, 141 N.E.2d 156 (1957), the Ohio Supreme Court noted: **"**Ordinarily, the existence of both negligence and proximate cause are, in a jury trial, questions of fact for the determination of the jury under proper instructions from the court."

foreseeability. As part of their standard of care, medical professionals are expected to be able to recognize certain symptoms of illness and injury, and they are expected to be aware of the associated risk of harm. *See Berdyck* at 581 (obstetrical staff nurses are expected to recognize symptoms of major obstetrical complications and take appropriate action to prevent harm). In other words, they are expected to foresee a risk of harm that a medical professional of ordinary skill, care, and diligence would foresee under similar circumstances. And just as with the general negligence standard, it necessarily follows that we would not expect medical professionals to guard against a risk of harm that a medical professional of ordinary skill, care, and diligence would not foresee. *See, e.g., Keebler v. Winfield Carraway Hosp.*, 531 So.2d 841, 844-845 (Ala.1988), citing *Fernandez v. Baruch*, 52 N.J. 127, 244 A.2d 109 (1968) (explaining that a physician does not have a duty to take measures to prevent a patient from committing suicide if the patient's suicide was not reasonably foreseeable under generally accepted medical standards). Accordingly, foreseeability of harm is relevant to a physician's standard of care, and a correct, general statement of the law regarding the standard of care or the breach of that standard includes the element of foreseeability.

*Cromer* at ¶ 28. Here, whether Kara Malone, M.D., Erin Walker, M.D., and Elizabeth Miller, R.N. were aware of the risk of uterine rupture, and whether Dr. Malone, Dr. Walker, and Ms. Miller recognized and properly acted upon certain symptoms of uterine rupture in accordance with the standard of care are squarely before the Court.

{¶26} Whether a standard of care articulated by an expert witness governs a duty of care is a question of fact, determined from all relevant facts and circumstances. *See Berdyck, supra*, at 584; *Burton v. Elsea*, 4th Dist. Scioto No. 97CA2556, 1999 Ohio App. LEXIS 6401, at *32 (Dec. 27, 1999), citing *Strother v. Hutchinson*, 67 Ohio St. 2d 282, 423 N.E.2d 467 (1981) ("disputes as to both the conduct of the parties and the standard of care are questions for the jury"). The Tenth District Court of Appeals has explained:

> With few exceptions, the trier of fact must determine the applicable standard of care in a medical malpractice case from the testimony of expert

witnesses. In *Turner v. Children's Hosp., Inc.* (1991), 76 Ohio App. 3d 541, 602 N.E.2d 423, we explained:

> Ordinarily, the issue of whether the physician has employed the requisite care must be determined from the testimony of experts, unless the standard of care is sufficiently obvious that laymen could reasonably evaluate the physician's conduct. * * * Such expert testimony serves to aid the trier of fact in determining if there was malpractice. For, although customary practice is evidence of what a reasonably prudent physician would do under like or similar circumstances, it is not conclusive in determining the applicable standard required. *Id.* at 548.

*Wheeler v. Wise*, 133 Ohio App.3d 564, 569, 729 N.E.2d 413 (10th Dist.1999).

**{¶27}** Here, the evidence shows that, at the time of Elshazli's admission to OSUWMC in June 2018, Defendant had a policy governing Vaginal Birth After Cesarean (VBAC). (Joint Exhibit P.) According to the VBAC policy, "Patients with a prior cesarean are at increased risk for uterine rupture, placenta previa, placenta accreta, and maternal or fetal death in a subsequent pregnancy. * * * The complication with the most serious consequences with regard to TOLAC is uterine rupture, which is associated with both fetal and maternal risks. When a uterine rupture occurs, maternal risks include hemorrhage, hysterectomy, operative injury, infection, anemia, and transfusion. Fetal risks in these circumstances include hypoxic injury and death. It is generally believed that the risk of uterine rupture during a spontaneously occurring trial of labor is approximately one in 200 (0.5%). However, the risk of uterine rupture depends on scar location/type, the number of prior incisions, and the type of labor." (Joint Exhibit P.) Through Defendant's VBAC policy, in June 2018 Defendant, as an academic medical center, had knowledge of the risk of uterine rupture with respect to a patient who is undergoing a trial of labor following a C-section, as well as the associated fetal risks and maternal risks.

**{¶28}** In June 2018 Dr. Walker, as a first-year resident in obstetrics/gynecology, and Ms. Miller, as a nurse with about 1½ years of experience in the area of labor and

delivery, not only had to be prepared to evaluate Elshazli for signs and symptoms of uterine rupture, but they also had to be prepared to acknowledge it and act upon it, if appropriate signs of uterine rupture occurred. This is not an easy task for relative neophytes.

{¶29} Uterine rupture is not a "common" occurrence in TOLAC patients, occurring in about 1% to 2% of such patients. When a uterine rupture occurs, the risk of death or serious injury for a TOLAC patient is in the range of 1%. Because the consequences of a uterine rupture can be so catastrophic, medical providers at OSUWMC must be on the alert for signs of it.

{¶30} The evidence shows that uterine rupture does not manifest itself in advance. In other words, confirmation of uterine rupture can only be done by surgical means, which can only occur after a medical emergency presents itself. Thus, Defendant's medical providers are required to be alert for signs of uterine rupture, especially in a TOLAC patient, since a TOLAC patient already has a scar susceptible of rupturing based on a prior Cesarean section. What complicates an analysis of the possible existence of uterine rupture is that the signs that suggest its presence are also signs that can point to other possible medical diagnoses.

{¶31} The evidence shows that signs of uterine rupture include abnormal fetal heart rate tracing, abdominal pain, vaginal bleeding, loss of fetal station, maternal hypotension, maternal tachycardia (and change in contractions). These signs are from Steven G. Gabbe, M.D., et al., *Obstetrics: Normal and Problem Pregnancies*, Chapter 20, 452 (7th Ed.2017). Not expressly included in the above signs is "shoulder pain."[5] However, the evidence in this case shows, and this Court so finds, that shoulder pain also can be a symptom of uterine rupture.

{¶32} None of these signs, if presented, can ONLY come from a uterine rupture. In other words, abdominal pain (to use just one example) can have different causes and have different effects; so just because a woman in labor has abdominal pain does not automatically mean that she is having a uterine rupture.

---

[5] "Classic signs" of a uterine rupture may be described as, an experience of horrible abdominal pain by a pregnant woman, profuse blood loss, and hemodynamic instability—not shoulder pain, which results due to irritation of the phrenic nerve.

{¶33} This Court heard the testimony of Christopher J. Robinson, M.D., MSCR, FACOG.  The Court agrees with Dr. Robinson's testimony that it is necessary for a medical team treating a TOLAC patient to have "situational awareness."  "Situational awareness" is vital, because the risks of uterine rupture are so consequential (i.e., the death of a baby or mother, or both)—that a TOLAC patient must be considered in a very different light than a patient who has not previously delivered a child by Cesarean section (or has had some other invasive surgical scar in a similar location).  It would not automatically be a breach of the standard of care to immediately "jump in" with a Cesarean section at the first hint of sign of uterine rupture, but the showing of a sign or signs (depending on the particular sign) must be met with an immediate and heightened awareness of the risks, with further and immediate investigation of just what the symptom can mean.  In other words, the maternal medical team must be aware that uterine rupture may exist when one or more signs of it become present.  The maternal medical team also must be ready to *act* if those signs are present.  So, if multiple signs of uterine rupture present, especially over time, with a TOLAC patient, then, given the obvious danger to mother or child, or both, a medical provider simply cannot afford to wait to see if the situation resolves itself.  Situational awareness demands otherwise. Therefore, for a TOLAC patient, the standard of care demands considerably more than waiting with the expectation that the signs that could be uterine rupture resolve themselves.  And it is for this reason, at least, that Defendant has a TOLAC patient sign, as was done here, a Consent Form that authorizes a delivery by Cesarean section.  As one witness commented, it would be inappropriate for an expectant mother, being rushed to a delivery room for a Cesarean section delivery, to have to sign a consent form in that time of emergency.

{¶34} Thus, the main issue in this case, since it is manifest that a uterine rupture did occur, is to determine, by a preponderance of the evidence, whether Defendant, through its medical team, acted appropriately when certain signs presented, or whether, by a preponderance of the evidence, Elshazli should have been transported for a Cesarean section at any time before 1254 hours.  This Court uses that time because it is the time given by Dr. Robinson as the last possible time for Malak to have been born without serious risk to her life or health.  Thus, in the Court's view, a Cesarean delivery

at 1313 hours was too late, because, despite the very quick and efficient rush of Elshazli to an operating room for her Cesarean section after the determination that a uterine rupture had most likely occurred, Malak was born with such natal deficiencies that she could not survive.

### A. The Court rejects Defendant's theory that the fatal injury to Malak occurred before Malak's birth.

{¶35} One of the two defenses presented in this case is Defendant's contention that Malak's death was the result of injury that predated her delivery by days, or even weeks.  This Court rejects, as being against the greater weight of the evidence, Defendant's theory that the fatal injury to Malak occurred before Malak's birth.

{¶36} The autopsy in this case was performed by Peter Baker, III, M.D. and Christopher Pierson, M.D., Ph.D., both of whom were and are affiliated with The Ohio State University.  They agree on the cause of death being uterine rupture by clinical history, with the most likely cause of death being extensive acute hypoxic ischemia.  While there was a mistake in the clinical history—the baby was NOT free-floating in the abdomen—that mistake did not affect the cause-of-death finding.

{¶37} Dr. Baker signed the final Official Death Certificate.  This Court notes that hypoxic ischemia is based on clinical findings, while "hypoxic-ischemic brain injury" is based on tissue examination.  These findings are consistent with each other.

{¶38} Dr. Pierson checked the autopsy report to make sure that its contents were consistent with his neuropathological findings.  They were.  Dr. Pierson also testified regarding "gliosis."  Gliosis may be reasonably defined as a nonspecific reactive change in the glial cells in response to something occurring in the central nervous system.  There are types of gliosis: myelination gliosis and reactive gliosis. Dr. Pierson did not use either term in the autopsy.  He testified that it "can be very difficult to distinguish an astrocyte reacting from a normal stimulus, physiologic stimulus, from a pathological stimulus." Since he cannot always differentiate between the two, he simply used the term "gliosis."

{¶39} A red neuron or red cell is an acidophilic or eosinophilic neuron.  Red neurons are signs of irreversible injury and are often seen in association with hypoxic-ischemic injury.  A pyknosis is an irreversible condensation of chromatin in the nucleus of

a cell undergoing necrosis.  Pyknosis often is used to refer to cells or neurons that undergo shrinkage.

{¶40} Purkinje cells are a unique type of neuron specific cell to the cerebellar cortex.  Such a cell is a large neuron that takes information out of the cerebellar cortex and sends it to the deep cerebellar nuclei and white matter.  Purkinje cells are sensitive to a lack of oxygen, although this is mostly so in adults.  In this case, Dr. Pierson testified that he did not see "any evidence of dropout of Purkinje cells, which would be more indicative of longstanding injury."  Thus, Dr. Pierson does not agree with the defense contention that the injury is days or weeks old.

{¶41} Contrary to the above, Ady Kendler, M.D., Ph.D. (whose qualifications are almost entirely identical to Dr. Pierson's) testified, in effect, that Malak had no acute neuronal injury; in other words, what killed this infant was days or weeks old.  Dr. Kendler noted the absence of red neurons, which he would have expected had the injury been "new" (that is, within hours of Malak's death).

{¶42} But both Dr. Pierson and Hannes Vogel, M.D. testified that they did find red neurons, even if Dr. Kendler did not.  Since the absence of red neurons is critical to Dr. Kendler's findings, the greater weight of the evidence is clearly against Dr. Kendler's theory.

{¶43} Dr. Kendler was not alone in the belief that what killed Malak was an injury of longer standing, and not the acute one stated in the autopsy report.  Harry T. Chugani, M.D., adjunct professor of Neurology at New York University, School of Medicine, agreed with Dr. Kendler's final conclusion; however, Dr. Chugani took a different approach in reaching that conclusion.  To him, the presence or absence of red neurons was not relevant.  He states that there was a brain stem failure, a failure that is not explained by the occurrence of a uterine rupture.  His clinical analysis is that core gases provide an informative clue: they give an indication whether there is damage to a baby's cells (not just brain cells).  Malak's initial pH was 7.13; low, but not terribly so. Because the brain reacts to aerobic or anerobic oxidation by producing lactic acid, one should expect a very different reading: the arterial pH should have been lower, and the venous pH should have been higher.  To Dr. Chugani, the brain damage was considerably worse than acidosis can explain.  But the injury was selective and diffuse, which he

testified is not consistent with a hypoxic-ischemic injury. He added that the presence or absence of red neurons is not relevant, because the injury that killed Malak Badawi occurred before Malak ever got to the hospital. Thus, the result was inevitable even if an emergency Cesarean section had been performed at, say, 10 a.m. on June 7th. But Dr. Chugani admitted that no other doctors treating Malak raised the issues that he, Dr. Chugani, did. In addition to the doctors noted above, Gordon Sze, M.D. of Yale University School of Medicine testified that Malak had acute profound prolonged hypoxic ischemia. To Dr. Chugani, that was wrong.

{¶44} This Court is not convinced that Dr. Chugani's opinion has merit. For one thing, Dr. Chugani's opinion flies in the face of so many other expert opinions. Just as importantly, as Plaintiff's counsel noted, Dr. Chugani's opinions are not directly in his field of expertise. For example, Dr. Chugani testified that "By definition, gliosis is not normal." But Dr. Kendler, Dr. Vogel, and Dr. Pierson all testified that there IS normal gliosis.

{¶45} In summary, the Court finds by a preponderance of the evidence that Malak Badawi did not die from a longstanding pre-existing injury, but, as stated in the NCH autopsy report, "[t]he underlying cause of death was uterine rupture (by clinical history). The most likely immediate cause of death was extensive acute hypoxic ischemic brain injury." (Autopsy Report, at 1.)

## B. Plaintiff has proven claims of medical negligence by a preponderance of the evidence.

{¶46} The arguments of counsel basically require this Court to decide whether, and when, a uterine rupture reasonably should have been suspected in this case. Defendant maintains that, if a decision is made for Badawi, then a natural consequence of that decision would be the elimination of the VBAC unit at The Ohio State University Wexner Medical Center, since (not unlike Chicken Little), a "The Sky is Falling" rationale must attend each and every TOLAC/VBAC birth.

{¶47} This Court respectfully disagrees.

{¶48} It is undisputed that, between the hours of 0840 and 1240, Dr. Malone (Elshazli's attending physician) did not see or observe Elshazli. And while Defendant is a teaching and academic hospital, and this Court gives some deference to that situation,

it must be said that leaving a TOLAC patient to be attended by a first-year resident (and a registered nurse with only slightly more experience), presents risks of its own. This is not to say that at every moment, Dr. Malone (or, say, experienced physicians in the field of obstetrics and gynecology, such as a Steven Gabbe, M.D., or a Mark Landon, M.D., of The Ohio State University Wexner Medical Center) must be present. That swings things to the opposite extreme. But situational awareness is not limited to evaluating signs and symptoms of (for example) uterine rupture; it includes the possibility that, however brilliant a first-year resident is (and this Court certainly notes that there is ample evidence that Dr. Walker has become an outstanding physician), such a person while in first year residency still has a very great deal to learn. The Court notes, for example, the commentary on the level at which Dr. Gabbe's text was written—for the medical student and the resident— as opposed to more experienced doctors.[6] Therefore, it is evident that a first-year resident (even one approaching the end of that first year) is not *that* far along in one's training. This Court understands and accepts this premise, because it is also very true regarding the practice of law.

**{¶49}** On June 7, 2018, Elshazli credibly communicated to a nurse, that she had no problem switching to a Cesarean section. One reason for this is that during the birth of Laila, Elshazli believed that that delivery was rushed. And although the medical records do not entirely support that belief, it is true that Laila's birth by Cesarean section was due to concern over Laila's "nonreassuring fetal well-being." In that sense, the Cesarean section was promptly done, which, considering the time-period for the possible vaginal delivery to that point, was considerably shorter in time. Unfortunately, there is nothing in the medical record that indicates that Elshazli's preference concerning Malak's birth was communicated to Dr. Walker or Dr. Malone. It should have been. Elshazli testified that, after her "water broke," a nurse informed her that meconium was present. Elshazli explained to the nurse, that if there was any risk to her baby, then she was fine with having a C-section. According to Elshazli, the nurse informed her that "No, no, no, it's fine" and that the presence of meconium meant that a physician should be present in the room at delivery. Since the position of OSUWMC is that the patient has the right to make her own

---

[6] No differentiation is made, in this context, between a first-year resident and a fourth-year resident, although, clearly, there is in fact a difference.

medical decisions, Elshazli's request should have been followed, or, at a minimum, discussed in more detail with her. Again, this did not happen.

{¶50} In this instance, several signs were present to Defendant's medical team. Dr. Robinson, who favorably impressed this Court with his testimony, noted that the first decel occurred around 0915, with bradycardia at 0922. He testified that Nurse Miller did the correct thing IF this were a regular pregnancy, but, of course, it wasn't: Elshazli was a TOLAC patient. Nurse Miller noted the late decels, and the strip was reviewed at 1024 by Dr. Malone.

{¶51} Dr. Robinson noted that at 1100, Elshazli experienced shoulder pain. Shoulder pain that involves irritation of the diaphragm is a definite sign of uterine rupture, and the irritation which leads to the shoulder pain can be caused by either fluid or by gas. It is a rare sign of uterine rupture, but it clearly is a sign, as Robert Small, M.D., an attending anesthesiologist at OSUWMC, seemed to recognize. Dr. Robinson testified that the 'judicious call' is to get the baby delivered. During this time, Malak was not having enough accels; that is, she was not getting enough blood delivered. During this time Elshazli's contractions were much flatter.

{¶52} These factors called for situational awareness. Again, at 1240 (when Dr. Malone arrives at Elshazli's bedside), Elshazli is on her hands and knees, and she has bradycardia. Given two bradycardias and the shoulder pain, waiting, and trying to do a vaginal delivery as 1313 approaches was a large mistake, according to Dr. Robinson, since, according to Elshazli's medical record, dilation was completed at 1158 on June 7th. (Joint Ex. A2, p. 150 of PDF.) At trial Dr. Robinson noted that once a sign (or signs) of uterine rupture occurs, rupture can literally come with the next contraction. This is the medical reason that situational awareness must take into account; yet, it was not done here.

{¶53} Defense experts were critical of Dr. Robinson's testimony, especially when considering the notion of air getting to the diaphragm to cause irritation. Their testimony was to the effect that the uterus is a closed system, so it cannot admit air, therefore, there was no possible way for air to have caused the diaphragmatic irritation referenced by Dr. Robinson. The Court might ordinarily accept that criticism as valid, except that after the water broke (at 0240), the system was no longer closed. Furthermore, there were

examinations that involved internal checking of Elshazli by the medical team, to ascertain the station of the baby, which again refute the notion of a "closed system." And this Court accepts the testimony that not a great deal of air ("only a bubble") is needed to cause such irritation.

{¶54} Yet another reason advanced by those critical of this portion of Dr. Robinson's testimony bears more discussion: whether a uterine rupture must be "sudden." Dr. Gabbe's text on uterine rupture, Chapter 20 (written by Dr. Landon, of The Ohio State University, and Dr. William B. Grobman), states that "Uterine Rupture **can be** catastrophic, sudden, and unpredictable." (Emphasis added). Counsel have repeatedly brought this sentence to the attention of the Court, and, after careful consideration of the testimony, and a review of that portion of the Chapter, this Court interprets this sentence to mean that uterine rupture does not *have* to be sudden, although it certainly can be. It is painfully evident that uterine rupture can be catastrophic (again, this is not always so), and it is also clear that uterine rupture is unpredictable. That unpredictability is noted in the sentence immediately following the above quoted sentence, which reads as follows*: "Persons who care for women undergoing TOLAC should be familiar with electronic FHR patterns that **may** be associated with uterine rupture as well as the potential need for emergent delivery."* A sentence preceding the above two quoted sentences reads as follows: "**Studies that have examined fetal heart rate (FHR) patterns before uterine rupture consistently report that nonreassuring signs, particularly prolonged decelerations or bradycardia, are the most common signs of uterine rupture.**" (Emphasis in the original). And in addition to the above quoted text, other testimony in this case clearly confirms the unpredictability of uterine rupture, as well as pointing out the relative importance of fetal heart rate patterns. And no other testimony (or textbook information) gives the slightest hint that uterine rupture is predictable. There are indicators, or signs, but nothing that can directly predict a uterine rupture.

{¶55} Having noted the foregoing, the Court looks to the sentence from Dr. Gabbe's text as an indicator that a uterine rupture need not necessarily happen all at once. By "complete" this Court means that the rupture need not completely rip open the entire length of the scar that exists from the prior Cesarean delivery. A uterine rupture exists when a through and through opening occurs at any location along the scar from

the previous Cesarean section.  Uterine rupture must also be distinguished from uterine scar dehiscence.  In the latter, the tear is not complete: part of the uterus is still intact.  A uterine rupture, once occurring, can be extended in length as further pressure is exerted on the tear, in other words.

{¶56} In the context of this case, neither Dr. Walker nor Nurse Miller had anything other than theoretical experience/exposure to cases of uterine rupture.  Dr. Malone, who had more familiarity, was physically absent during the critical four-hour period noted above.

{¶57} Defendant contends, however, that Dr. Malone, Dr. Walker, and Nurse Miller did not deviate from the standard of care.  In this regard, Defendant presented Anthony Sciscione, D.O., whose testimony ran directly counter to that of Dr. Robinson.  This Court does not find Dr. Sciscione's testimony in this case to be as credible as Dr. Robinson's.  There are several reasons for this.  First, Dr. Sciscione was reluctant to acknowledge prolonged decels in this case.  He initially testified that he thought the FHR in the 0920 time frame was a "variable deceleration."  This Court is clearly a rank amateur in assessing FHR strips, but when the Court pointed out to Dr. Sciscione that there was "a squiggle" at about 0925:20 to 0925:27, and that that mark was around the "80" range—Dr. Sciscione then agreed that this time frame did, in fact, present as a prolonged decel, "although it's hard to interpret.".  Other witnesses clearly indicated that this was a prolonged decel.  This Court was, and is, reluctant to give much weight to the FHR interpretations of Dr. Sciscione.

{¶58} A second reason is that Dr. Sciscione testified that he disagreed with the statement that uterine rupture is the principal risk that presents with a TOLAC patient.  The quotation, taken from the Gabbe text, was affirmed by every other medical professional who testified in this case.  It is also in the Policy Statement of Defendant.

{¶59} A third reason is that, unlike every other doctor who testified, Dr. Sciscione testified that shoulder pain has absolutely no connection with uterine rupture.  This Court was startled to hear this, and so directly asked Dr. Sciscione about it, and in no uncertain terms Dr. Sciscione reiterated that same answer to the Court.[7]

---

[7] "The Court: 'Basically, what I understand you to say is that shoulder pain has absolutely no connection with uterine rupture.  Is that a fair statement?'

{¶60} Further, while Dr. Sciscione testified that based on the information provided to him that Dr. Walker had participated in 157 births, which, as he noted, was a very high number, he failed to mention, or distinguish, that NONE of these births involved a TOLAC patient. In fact, as the record indicates, Elshazli was Dr. Walker's first TOLAC patient. Even the word "participation" is fraught with ambiguity. To this Court, Dr. Sciscione appeared to be inflating Dr. Walker's qualifications.

{¶61} Moreover, Dr. Sciscione has given the same type of testimony relating to cause of death in ten other cases of this type, arguing that a pre-existing injury occurred that caused the baby's death. While this consistent similarity was not further explored, it certainly raised a significant question mark with this Court.

{¶62} In short, Dr. Sciscione provided a number of reasons (and the above is not necessarily a complete list) for this Court to discredit the salient points of his testimony.

{¶63} The record is clear that for four hours, from 0840 to 1240, Dr. Malone was not present in the same room as Elshazli. This, in and of itself, is not a breach of the standard of care. However, when warning signs of uterine rupture present—as they did here—her absence left Elshazli with two persons essentially responsible for her care: Dr. Walker and Nurse Miller. Dr. Walker had never treated a TOLAC patient before, and she was a first-year resident at the time. This Court believes that had Elshazli not been a TOLAC patient, the care provided by Dr. Walker and Nurse Miller would have been sufficient to meet the standard of care.

{¶64} But Elshazli was a TOLAC patient, and the record that presents is clear that this difference made all the difference in finding that Dr. Malone, Dr. Walker and Nurse Miller failed to meet the standard of care in this case. Certainly, ambiguity existed as to each purported sign of uterine rupture, but this Court notes that that is *always* the case, because uterine rupture simply cannot be confirmed until after the event takes place.

{¶65} Summarily stated, there were signs of uterine rupture from 0920 right up to 1313 on June 7, 2018: First, there was a significant prolonged decel starting around

---

A: 'Yes, Judge, because it makes no sense physiologically.'" Defense counsel attempted to walk this back, indicating that Dr. Sciscione was merely referring to this case, but this Court did not and does not read his testimony that way.

0920:52, or at least by 0921:12 to 0921:20, and this decel lasts until about 0925:10. That is approximately four minutes in length, about twice as long as the basic definition of a prolonged decel. Second, although the prolonged decel come back to the baseline, a return to baseline is a part of the definition of a prolonged decel.

{¶66} Plaintiff argues that there was another prolonged decel at starting at 1056:07 to 1057:50. This Court disagrees, as that does not (quite) fit the 2-minute requirement of having a FHR at least 15 bpm under the baseline. It is close, to be sure, but if one accepts the definition of a prolonged decel as noted above, this does not qualify.

{¶67} However, there is no doubt to this Court that there were significant prolonged decels occurred from 1234:55 to 1237:50, and from 1239:50 (at least) to 1244:47 (almost five minutes).[8] Yet another prolonged decel occurred at 1305:00 to 1307:15. Finally, a lengthy prolonged decel took place from 1312:48 on.[9] The FHR monitor was disconnected just after 1318.

{¶68} There were also a significant number of recurrent decels. These took place between 0910 and 0950; 10:30 to 10:50; 1220 to 1240; and 1300 to 1318. As Dr. Stafford noted, "It would definitely be—it would be reasonable—I'm sorry—to have a heightened suspicion [of uterine rupture], especially with the second one you circled there."

{¶69} Based on the foregoing, there was certainly a reason to give significant consideration to the possibility of uterine rupture. However, there is more.

{¶70} One of the most contentious issues in this case involved the issue of shoulder pain. It is undisputed that Elshazli experienced shoulder pain at around 1040. But the question arises whether that pain was a symptom of uterine rupture.

{¶71} Despite not being a symptom of uterine rupture expressly stated in Dr. Gabbe's text, the medical professionals in this case (with the exception of Dr. Sciscione) were in agreement that shoulder pain definitely could be a symptom of uterine rupture

---

[8] The Court notes that for much of this time, the FHR monitor has a great deal of "skips" in it. However, none of the markings—when present—show anything that approaches a return to baseline. And while Elshazli was being repositioned during this time, from being on her back to 'hands and knees', when there ARE markings, as noted above, nothing presents as a return to baseline. It is much more likely, certainly much more than a preponderance of the evidence, that the FHR remained far below the baseline.

[9] Dr. Malone testified that the decel occurred from about 1312:45 to 1316:55 (she circled the parameters on a copy of the chart).

due to irritation of the phrenic nerve, which controls the diaphragm. Having said that, shoulder pain is not an exclusive sign of uterine rupture, and it is a sign that is considered to be rare. The irritation caused by fluid or gas causes shoulder pain. This Court accepts the testimony of Dr. Robinson that air (or fluid) can escape the uterus during labor—the uterus is not as closed a system as the defense argues. The defense argues, however, that this presentation of shoulder pain was reproducible, something that should not be the case with diaphragmatic irritation. This Court respectfully disagrees. As Elshazli is being moved from side to side, the gas will go to the higher point of the body (much like air in a bottle of water). This of course could cause the pain to reproduce. While this is a closer call than other signs of uterine rupture (as noted, shoulder pain is a rare sign of uterine rupture), the existence of the shoulder pain is something that, in conjunction with all other symptoms, should have resulted in a situational awareness that there was a growing chance of uterine rupture.

{¶72} The connection between shoulder pain and uterine rupture was noted by Dr. Small, an anesthesiologist. He understood that this was not an issue of anesthesia, and this Court agrees. Defendant's argument that three doctors were evaluating Elshazli sounds good, but in context, one was a first-year resident, the second was an anesthesiologist in training, and the third was Dr. Small, an anesthesiologist. With all due respect, this is not as comforting a thought as would appear on the surface, especially since an obstetrician is said to be on call 24 hours/7 days a week.

{¶73} There is also sufficient evidence of maternal tachycardia from 1040 on. This, too, is a warning sign of uterine rupture.

{¶74} All these signs, combined with the absence of Dr. Malone from 0840 to 1240, lead this Court to the conclusion that, by a preponderance of the evidence, Dr. Malone (by her absence), Dr. Walker (a first-year resident), and Nurse Miller breached the standard of care in regard to Elshazli. A Cesarean delivery should have been ordered well before 1313.

{¶75} The next issue is whether such negligence was the proximate cause of Malak's death. In *Jeffers v. Olexo*, 43 Ohio St.3d 140, 143, 539 N.E.2d 614 (1989), the Ohio Supreme Court discussed the concept of proximate cause:

"Proximate cause is a troublesome phrase. It has a particular meaning in the law but is difficult to define. It has been defined as: 'That which immediately precedes and produces the effect, as distinguished from a remote, mediate, or predisposing cause; that from which the fact might be expected to follow without the concurrence of any unusual circumstance; that without which the accident would not have happened, and from which the injury or a like injury might have been anticipated.' 65 C.J.S. § 103 Negligence pp. 1130-1131. * * *" *Corrigan v. E. W. Bohren Transport Co.* (C.A. 6, 1968), 408 F. 2d 301, 303.

*Accord Aiken v. Indus. Com.*, 143 Ohio St. 113, 117, 53 N.E.2d 1018 (1944) (noting that in the field of torts "the proximate cause of an event is that which in a natural and continuous sequence, unbroken by any new, independent cause, produces that event and without which that event would not have occurred"). *See* Dobbs, Hayden, and Bublick, *The Law of Torts*, Section 198, 681 (2d Ed.2011) ("proximate cause rules are among those rules that seek to determine the appropriate scope of a negligent defendant's liability" (footnote omitted)).

{¶76} Based on the previously discussed analysis of events that took place on June 7, 2018, relative to the negligence claim, this Court is convinced by a preponderance of the evidence that the negligence of Defendant's medical professionals was the proximate cause of the death of Malak Badawi. Dr. Malone's absence from Elshazli's room between the hours of 0840 and 1240—a time that key events occurred relevant to a determination whether a C-section should have been performed—coupled with Defendant's medical team's collective lack of situational awareness whether Elshazli may be experiencing a uterine rupture during the hours of 0840 and 1240 proximately caused Malak to sustain extensive acute hypoxic ischemic brain injury and such collective negligence is sufficient to impute liability to Defendant by a preponderance of the evidence.

{¶77} Before moving to the issue of damages, some additional comments are necessary. First, Badawi credibly testified that Dr. Malone kept saying, "This is normal," and "We're far away from this being an emergency," in reference to what was occurring from 1240 to 1313. This presents to the Court the notion that what Dr. Malone preferred

to achieve in this case was a successful vaginal delivery. While, in one sense, that is to be commended (in the abstract), it simply is not in accord with situational awareness of what happened between 0840 and 1240.

{¶78} Second, this Court wishes to add to its ruling that limited the testimony of Stephen Thung, M.D. Dr. Thung performed an act of kindness when, upon seeing a person crying, went to provide comfort and find out if there was anything he could do. Upon learning of this tragedy, Dr. Thung stated that he would try to find out what happened in reference to Malak's death. This is entirely praiseworthy.

{¶79} But what happened after that is that Dr. Thung became a critical part of the Review Committee, which exists to determine what happened in any particular case, so as to review the actions of a doctor whose patient did not have a desirable outcome. The work of such a review committee is rightly protected as confidential and non-discoverable by law.

{¶80} But by being an integral part of the Review Committee, Dr. Thung would be absolutely prohibited from disclosing anything relative to the merits of the case to Badawi and Elshazli. And it puzzles the Court as to why Dr. Thung would assure a grieving parent that he would try to find out what happened, yet then be in a position to be absolutely unable to tell them anything of substance about what the Review Committee did.

{¶81} The first thing Dr. Thung testified to when he took the stand was to say "I don't know why Malak died." When considering that statement, this Court realized that Dr. Thung was testifying as someone who was a part of the Review Committee; indeed, a most valued participant. That testimony, coupled as it was with the privileged nature of his investigation, caused this Court to take a very dim view of letting him testify on the merits of this case. This is because his initial statement was fraught with possible waiver. Had Plaintiff pressed the issue, this Court may well have found that by that statement ("I don't know why Malak died"), Dr. Thung waived the privilege concerning the Committee's work. So rather than address the issue of waiver, the Court opted to strictly limit his testimony. There was no other option, especially given the staunchly protective mode of defense counsel during Dr. Thung's deposition.[10]

---

[10] The Court is **not** saying that it disagrees with the legal position taken during that deposition.

### V. Plaintiff is entitled to damages for mental anguish and loss of consortium.

{¶82} In an action for wrongful death, the personal representative is a nominal party, and the statutory beneficiaries are the real parties in interest. Damages for wrongful death are awarded to the decedent's family to compensate for the injury they suffered as a result of the decedent's untimely death. *Perry v. Eagle-Picher Industries,* 52 Ohio St. 3d 168, 170, 556 N.E. 2d 484 (1990) (internal citations omitted). In this case, the real parties in interest are Mohamed Badawi, Sara Elshazli, and Laila Badawi. Ali Badawi, born in 2020, is a family member, but is not a party in interest in this case. Mohamed Badawi has not included Ali Badawi in the Complaint or requested an award of damages for him.

{¶83} R.C. 2125.02 pertains to damages in a wrongful death action. R.C. 2125.02(D) provides:

> Compensatory damages may be awarded in a civil action for wrongful death and may include damages for the following:
>
> (1) Loss of support from the reasonably expected earning capacity of the decedent;
>
> (2) Loss of services of the decedent;
>
> (3) Loss of the society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, suffered by the surviving spouse, dependent children, parents, or next of kin of the decedent;
>
> (4) Loss of prospective inheritance to the decedent's heirs at law at the time of the decedent's death;
>
> (5) The mental anguish incurred by the surviving spouse, dependent children, parents, or next of kin of the decedent.

*Compare* R.C. 2125.02 (D)(3) (loss of consortium) *with* (D)(5) (mental anguish). *See Black's Law Dictionary 1133* (11th Ed.2019) (defining "loss of consortium" as "1. A loss of the benefits that one spouse is entitled to receive from the other, including companionship, cooperation, aid, affection, and sexual relations. * * * 2. A similar loss of benefits (minus sexual relations) that one is entitled to receive from a parent or child").

{¶84} In the Complaint, specifically in Count III, Wrongful Death, at paragraph 33(a), Plaintiff requests damages for "Mental anguish incurred *by the parents* by reason of the death of the infant." (Emphasis added.) In subparagraph (b), Plaintiff requests damages for "Loss of the society, companionship, comfort, love, solace, assistance, and care to the parents of the deceased." In short, this is a request for damages for loss of consortium.

{¶85} "'The cardinal principle of damages in Anglo-American law is that of *compensation* for the injury caused to plaintiff by defendant's breach of duty.' 2 F. Harper & F. James, Law of Torts § 25.1, p. 1299 (1956) (emphasis in original).'" (Footnote omitted.) *Carey v. Piphus*, 435 U.S. 247, 254-255, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). *Accord Fantozzi v. Sandusky Cement Prods. Co.*, 64 Ohio St.3d 601, 612, 597 N.E.2d 474 (1992) ("[t]he fundamental rule of the law of damages is that the injured party shall have compensation for all of the injuries sustained"). The Ohio Supreme Court has explained:

> Compensatory damages are intended to make whole the plaintiff for the wrong done to him or her by the defendant. * * * Compensatory damages are defined as those which measure the actual loss, and are allowed as amends therefor. For example, compensatory damages may, among other allowable elements, encompass direct pecuniary loss, such as hospital and other medical expenses immediately resulting from the injury, or loss of time or money from the injury, loss due to the permanency of the injuries, disabilities or disfigurement, and physical and mental pain and suffering. * * * Other elements such as pain and suffering are more difficult to evaluate in a monetary sense. The assessment of such damage is, however, a matter solely for the determination of the trier of fact because there is no standard by which such pain and suffering may be measured. In this regard, this court has recognized that "no substitute for simple human evaluation has been authoritatively suggested." *Flory v. New York Central RR. Co.* (1959),170 Ohio St. 185, 190, 10 O.O.2d 126, 128, 163 N.E.2d 902, 905.

*Fantozzi*, 64 Ohio St.3d at 612, 597 N.E.2d 474 (1992).

{¶86} The Tenth District Court of Appeals has remarked that appellate review of the adequacy of a trial court's award for noneconomic damages, such as mental anguish or loss of consortium, "is difficult because no specific yardstick, or mathematical rule exists for determining pain and suffering." *Hohn v. Ohio Dept. of Mental Retardation & Dev. Disabilities*, 10th Dist. Franklin No. 93AP-106, 1993 Ohio App. LEXIS 6023, at *10 (Dec. 14, 1993), citing *Fantozzi* at 612; *Carter v. Simpson*, 16 Ohio App.3d 420, 423, 476 N.E.2d 705 (10th Dist.1984). The Tenth District Court of Appeals stated in *Hohn* that "[i]n reviewing the reasonableness of a pain and suffering award, a court may consider awards given in comparable cases as a point of reference, see *Hancock v. Norfolk & Western Ry. Co.* (1987), 39 Ohio App.3d 77, 85, 529 N.E.2d 937, but ultimately must evaluate each case in light of its own particular facts. *Id.*" *Hohn* at *10.

{¶87} In assessing the proper amount of damages that should be awarded, this Court notes that Plaintiff opted not to have an economist testify. As a result, the damages to be awarded in this case solely relate to mental anguish and loss of consortium. Badawi asks for damages for himself, for Elshazli, and for Laila.

{¶88} First, as to Laila. Although Badawi requests an award of damages for her, such damages were not requested in the Complaint ("[m]ental anguish incurred *by the parents*").[11] Thus, although the Court has heard testimony regarding the effect of Malak's death on her, an award of damages is inappropriate, given that Laila was not included in the Complaint. Therefore, the Court will not grant an award of damages for her mental anguish.

{¶89} The mental anguish of Malak's parents was properly pled. In addition to the mental anguish about the loss caused by Malak's death, there is the mental anguish over just how the death of Malak occurred. This is not to say that Malak's death was intentional, as it obviously was not. But it was avoidable, and there is a lingering guilt on the part of the parents (even if undeserved) over what occurred.

{¶90} Badawi was in Elshazli's hospital room during the crisis point after 1 p.m. on June 7th. Dr. Malone reassures even then that "This is normal" and "We're far away from this being an emergency." The Court notes this not to necessarily find fault with Dr.

---

[11] Complaint, Paragraph 33 (a).

Malone for saying those things (although it disagrees with them), but that they remained in the memory of Badawi. The guilt, or suffering, comes from feeling so helpless as Elshazli was taken into the operating room for the emergency C-section; she was crying intensely as she knew something was now dreadfully wrong. This is also true for Badawi; who felt so helpless when learning of the horrible result. And, for being so helpless in terms of his commitment to Elshazli; that he somehow failed not only Malak, but Elshazli as well. Badawi is trying to find some joy in life again.

{¶91} For Elshazli, the feeling is even worse. She is Malak's mother. The decision to go the TOLAC route, although agreed to by both Badawi and Elshazli, was more Elshazli's decision than Badawi's. There will not be a day in Elshazli's remaining time on Earth where, as long as she remains in possession of her mental faculties, she is not reminded of this tragedy, and of her central position in it. The depth of her grief was testified to by Audra Jorday, R.N., who has experience in this area, and noted that she had never seen anything like the grief exhibited by Elshazli. Elshazli did not want to eat, shower, or even leave the hospital. Both Badawi and Elshazli reacted to Malak's death as if it had just occurred, even though some days had passed. Both parents told Nurse Jorday that they were having 'flashbacks' to being in the operating room. Elshazli testified about how greatly the death of Malak affected her, about the pain and the guilt and the hollowness in her heart that she has to carry with her. She had a good friend who had a due date close to the time of Malak's, and that friend delivered a healthy baby. Elshazli has avoided this friend because of all the things her friend's baby can do that Malak would never live to do. Elshazli and Badawi were both diagnosed with PTSD as well.

{¶92} Elshazli has suffered profound guilt because she could not save Malak's life. Badawi testified to this as well—about Elshazli's strong feelings of guilt, and the large sense of anxiety and loss. Elshazli testified that her heart "cringed" over being unable to save Malak. Even with Elshazli's relocation to Illinois, Elshazli is reluctant to socially engage. When Elshazli is asked about how many children she has, she answers "Two" then feels badly about this answer, but she does not wish to relate the story of Malak's brief life. Badawi noted that Elshazli has become very risk averse; she won't even ride a roller coaster now.

{¶93} In summary, Elshazli and Badawi's lives are forever changed as a couple, as parents, and as individuals.

{¶94} If there is a greater loss than the loss of a child to a parent, this Court does not know what it is. The photograph of Badawi and Elshazli holding Malak is one that shows the depth of feeling that they had for the child. Added to that is the terrible anguish that accompanied Badawi and Elshazli's decision to remove Malak from life support, when that never should have had to happen. Plaintiff's counsel suggested using a formula to determine the amount of damages. This Court has always been somewhat wary of using a formula in these circumstances. Mental anguish is not a constant. Some days, it can overwhelm. On other days, at times, it tends to move towards the background. But never does the mental anguish go away. No caring parent's life is ever the same again, and Badawi and Elshazli are very caring parents. No amount of money can adequately compensate for such a loss. Having said that, monetary compensation is the only way that exists in our system of law to give some semblance of justice to the bereaved. It is unsatisfactory in that sense, but it is all that we have.

{¶95} The Court understands the questions of defense counsel about the cost of raising and educating a child. Those are expenditures that, tragically, no longer have to be made in Malak's case, but certainly would have existed had she survived. But such a calculation, while necessary in determining a proper award for economic damages, has little, if anything, to do with mental anguish, and it is the latter, and not the former, that this Court must address. If economic damages were to be awarded, of course they would be diminished by the aforementioned costs of raising the child.

{¶96} Likewise, there can be no measure or consideration regarding punitive damages, or punishment, in determining the measure of damages for pain and suffering. There is not one member of the medical team who wanted anything other than the delivery of a healthy and fit baby for Badawi and Elshazli. In truth, there is clearly some anguish on their part as well. No one wanted this to happen. And while that is not relevant in determining the appropriate measure of damages for mental anguish for Badawi and Elshazli, this Court is not without an appreciation of the good intentions of the medical professionals who attended Elshazli. Again, no one wanted this result. Unfortunately, however, there was sufficient negligence to have proximately caused this result.

{¶97} Based upon the evidence before the Court, and in spending a considerable amount of time in trying to reach a just and proper amount of damages for mental anguish, the Court, having reviewed the testimony relevant to the issue, finds that damages for mental anguish are awarded to Mohamed Badawi in the amount of One Million Dollars (USD 1,000,000.00). Damages for mental anguish are awarded to Sara Elshazli in the amount of One Million, Two Hundred Fifty Hundred Thousand Dollars (USD 1,250,000.00). Damages for Loss of Consortium are awarded to Sara Elshazli and to Mohamed Badawi in the amount of Two Hundred and Fifty Thousand Dollars each (USD 250,000.00) for a total damages award of Two Million, Seven Hundred Fifty Thousand Dollars (USD 2,750,000.00).

## VI. Conclusion

{¶98} For reasons set forth above, the Court holds that Mohamed Badawi, as Administrator of the Estate of Malek Badawi, is entitled to a judgment in his favor in the amount of Two Million, Seven Hundred Fifty Thousand Dollars (USD $2,750,000.00), plus Twenty-Five Dollars (USD $25.00) (the cost of the filing fee) and post-judgment interest.

{¶99} It is so Ordered.

PATRICK E. SHEERAN
Judge

[Cite as *Badawi v. Ohio State Univ. Wexner Med. Ctr.*, 2023-Ohio-2654.]

| | |
|---|---|
| MOHAMED BADAWI, Admr. | Case No. 2019-00122JD |
| Plaintiff | Judge Patrick E. Sheeran |
| v. | <u>JUDGMENT ENTRY</u> |
| THE OHIO STATE UNIVERSITY WEXNER MEDICAL CENTER | |
| Defendant | |

## IN THE COURT OF CLAIMS OF OHIO

{¶100} For reasons set forth in the Decision filed concurrently herewith, the Court holds that Plaintiff has proven claims of negligence and wrongful death by a preponderance of the evidence. Judgment is entered in favor of Plaintiff. The Court awards damages in the amount of Two Million, Seven Hundred Fifty Thousand Dollars (USD $2,750,000.00), plus Twenty-Five Dollars (USD $25.00) (the cost of the filing fee) and post-judgment interest. Court costs are assessed against Defendant. The Clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

PATRICK E. SHEERAN
Judge

**Filed June 14, 2023**
**Sent to S.C. Reporter 7/31/23**