WILBURN, Appellant,

v.

CLEVELAND PSYCHIATRIC INSTITUTE, Appellee.

[Cite as *Wilburn v. Cleveland Psychiatric Inst.* (1998), 126 Ohio App.3d 153.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 97API08–1025.

Decided Feb. 5, 1998.

*Schulman, Schulman & Meros* and *John C. Meros,* for appellant.

*Betty D. Montgomery,* Attorney General, *Susan M. Sullivan* and *Eric A. Walker,* Assistant Attorneys General, for appellee.

---

CLOSE, Judge.

This is an appeal from a judgment of the Ohio Court of Claims finding that Cleveland Psychiatric Institute ("CPI"), defendant-appellee, was not negligent in its care and treatment of Edna Wilburn and that CPI was not the proximate cause of Edna's damages.

Edna began exhibiting stroke-like symptoms on February 26, 1994. She sought treatment at the emergency room of University Hospitals of Cleveland. The hospital staff initiated a stroke protocol, but Edna's CT scan and lab work appeared normal. Therefore, except for her symptoms, Edna did not seem to be suffering from a stroke, so a hospital psychiatrist interviewed her. The interview revealed that Edna recently had been confronted with several stressful situations. Based on all of the information, the psychiatrist diagnosed Edna with conversion reaction, which is a mental illness causing physical impairment without any organic basis. Consistent with this diagnosis, Edna's stroke-like symptoms began improving and she returned home on the same day.

On February 27, 1994, however, Edna's symptoms worsened. She again sought treatment at the emergency room of University Hospitals. The hospital staff took Edna's history and conducted a physical, which indicated that a positive right-side Babinski reflex was present. The positive Babinski reflex would tend to eliminate conversion disorder as the cause of the physical impairment. In addition, a neurology consultation was completed. Again, no clinical evidence of a stroke was found. The staff of University Hospitals provisionally determined that Edna suffered from a conversion disorder and referred her to CPI to rule out that provisional diagnosis. Dr. Scott Pacer wrote the orders to CPI, indicating that Edna's care should include a neurological consultation and EKG to help determine whether she actually was suffering from conversion disorder. Before being admitted to CPI, Edna was medically cleared by St. Vincent's Charity Hospital as required by CPI.

Edna was transferred to CPI on February 28, 1994. Dr. Julio Sales, a staff psychiatrist at CPI, began caring for her. Sales cancelled Pacer's referring orders; therefore, he never ordered an EKG or a neurological examination even though he stated that he understood the importance of a positive Babinski reflex. Dr. Elena Buendia, a staff physician at CPI, conducted an incomplete physical examination of Edna; she did not test for a Babinski sign, she did not review

Edna's medical records from the other hospitals, and she did not follow up with another examination or with other tests.

Although Edna's condition did not appear to worsen significantly during her stay at CPI, she repeatedly fell and injured herself. She also continued to lose control of her bladder. On March 25, 1994, CPI discharged Edna to her home despite the fact that she could not completely ambulate by herself, she had fallen only four days earlier, and she continued to have problems with bladder control. Edna had been at CPI for twenty-five days. At the time of her discharge, Sales still believed that Edna was suffering from conversion disorder, and he referred her to an outpatient mental health facility.

On April 12, 1994, Edna suffered a severe and disabling stroke. She arrived at MetroHealth Medical Center for care. Dr. Donald Kikta, a neurologist, diagnosed Edna with a rare disease called thrombotic thrombocytopenia purpura ("TTP"), a blood disorder that causes strokes. He indicated that this disease had caused Edna's initial symptoms. When Edna was admitted to MetroHealth, she also suffered from pneumonia and anemia. Edna had not suffered from conversion disorder, but from the symptoms caused by TTP.

Plaintiff-appellant, Mary Wilburn, is the mother and legal guardian of Edna. Appellant filed a complaint against CPI alleging that CPI was negligent for treating Edna for a mental illness that she did not have and that, as a result of CPI's negligence, Edna suffered a second debilitating stroke. The trial was bifurcated and proceeded on the issue of liability. The trial court held that appellant failed to prove that CPI should be held to the same standard of care as a general hospital in the diagnosis and treatment of stroke patients, that CPI was not negligent in its care and treatment of Edna, and that CPI's diagnosis of conversion disorder was not the proximate cause of Edna's injuries.

Appellant brings three assignments of error:

"Assignment of Error I:

"The Court of Claims committed reversible error in holding that appellee cannot be held to the same standard of care as a general hospital in treating its patients' medical conditions; CPI should be held to the standard of care set forth in its policy and practice manuals.

"Assignment of Error II:

"The court of claims committed reversible error in holding that appellee had no liability even if it was negligent in its care and treatment of Edna M. Wilburn because her second stroke was not preventable; the court failed to apply the holding of *Roberts v. Ohio Permanente Med. Group, Inc.* (1996), 76 Ohio St.3d 483, 668 N.E.2d 480, regarding liability for loss of less–than–even chance of recovery.

"Assignment of Error III:

"The Court of Claims committed reversible error in holding that appellee was not negligent in its care and treatment of Edna M. Wilburn; the court's ruling was against the weight of the evidence and contrary to law."

The issue in appellant's first assignment of error is whether the trial court applied the correct legal standard to determine the appropriate standard of care for CPI. The Ohio Supreme Court held in *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, that, in order to establish medical malpractice, the plaintiff must show (1) the standard of care recognized by the medical community, (2) the failure of the defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained. The appropriate standard of care must be proven by expert testimony. *Id.* That expert testimony must explain what a physician of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances. *Id.*

Appellant and CPI presented experts to testify about the appropriate standard of care. Appellant's expert opined that the CPI psychiatrist deviated from an acceptable standard of care in the field of psychiatry, specifically in the diagnosis of conversion disorder. CPI's expert opined that CPI, as a psychiatric hospital, depended on a medical diagnosis from an outside medical source and that, if anything, CPI should be held to a lower standard of medical care and a higher standard of psychiatric care.

The trial court also considered *Johnson v. Grant Hosp.* (1972), 32 Ohio St.2d 169, 178, 61 O.O.2d 413, 418, 291 N.E.2d 440, 445, and *Sabol v. Richmond Hts. Gen. Hosp.* (1996), 111 Ohio App.3d 598, 676 N.E.2d 958, to determine the appropriate standard of care for CPI. In *Johnson,* the Ohio Supreme Court held:

"A general hospital, which ordinarily does not and is not equipped to treat mental patients, should not be held to the same standard of care as a hospital which is operated and equipped to provide care for a patient who has displayed a tendency to commit suicide."

The Eighth District Court of Appeals followed *Johnson* in *Sabol* and stated:

"Crucial to *Johnson* is the idea that a general hospital caring for a suicidal patient cannot be held to the same standard of care as a specialized hospital which routinely deals with such patients." *Sabol* at 602, 676 N.E.2d at 961.

Both courts made it clear that a specialized hospital should be held to a higher standard of care because it specializes.

In this case, the trial court cited the *Johnson* and *Sabol* cases in order to hold that a psychiatric hospital caring for a stroke patient cannot be held to the

same standard of care as a medical hospital that routinely deals with such patients. Therefore, the trial court stated that appellant had not proven that CPI failed to meet the requisite standard of care because CPI could not be expected to diagnose a rare disease when the medical hospitals could not. We conclude that the trial court misapplied the holdings of *Johnson* and *Sabol.*

The trial court focused on the issue of whether CPI's staff fell below the standard of care when they failed to diagnose Edna with TTP. The trial court did not address the issue of whether Sales failed to meet the standard of care when he did not rule out conversion disorder. The problem in this case does not arise from CPI's failure to diagnose Edna's rare disease, the problem stems from CPI's failure to determine that Edna was not suffering from conversion disorder so that she could be referred back to a medical facility for further workup.

CPI represented itself as a facility specializing in the care of patients with psychiatric disorders. It also claimed to have access to facilities in order to address a patient's medical needs. CPI's hospital profile indicated that CPI provided comprehensive services that address not only the consumer's psychiatric and emotional problems, but also the consumer's medical and clinical needs. CPI had a full-time physician on staff and a neurologist and radiologist under contract.

Pacer sent Edna to this comprehensive psychiatric treatment facility for the staff to determine whether Edna was suffering from conversion disorder. Pacer had asked Sales to rule out that Edna was suffering from conversion disorder because Edna's symptoms were inconsistent with her medical results. Pacer did not send Edna to CPI to necessarily be treated for conversion disorder. Yet Sales cancelled the EKG and CT scan that were ordered by Pacer, which may have been helpful in the diagnosis. Sales ordered no further medical test to be performed on Edna, and he discharged her to outpatient care for the treatment of conversion disorder. Sales did not recommend any medical treatment, nor did he request a medical consultation for a neurological disorder at that time. If Edna had received a proper psychological workup, conversion disorder should have been ruled out and the search for the medical problem would have continued.

It is important to note that, although CPI's expert stated that Edna had already suffered a stroke when she entered CPI and that her second stroke was unpreventable, appellant's expert testified that "more likely than not had she [Edna] been treated * * * the outcome would have been far more favorable" and that Edna would have been much better on anticoagulants at the appropriate time. These experts are not inconsistent in suggesting that, even though medical care could not have prevented Edna from suffering a stroke, it could have reduced the damage caused by one.

158

As stated by the experts in this case, CPI should be held to a higher standard of care in diagnosing psychiatric disorders. Although not required to diagnose TTP, CPI was required to use what medical tests were necessary to rule out conversion disorder. We hold that the trial court incorrectly applied the legal standard when determining the appropriate standard of care.

Appellant's first assignment of error is sustained.

We need not address the second and third assignments of error at this time because the first assignment of error is dispositive; therefore, the remaining issues are moot and, pursuant to App.R. 12(A)(1)(c), will not be considered.

The trial court's judgment is reversed, and we remand this cause for the trial court to apply the correct legal standard in making its determination.

*Judgment reversed*
*and cause remanded.*

BOWMAN and LAZARUS, JJ., concur.